2026 IL App (2d) 250436-U
No. 2-25-0436
Order filed March 26, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* MARRIAGE OF SARI GROSSMAN, Petitioner-Appellant,

and JEFFERY ROTHBART, Respondent-Appellee.

Appeal from the Circuit Court of Lake County.
Honorable Patricia L. Cornell, Judge, Presiding.
No. 19D776

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The court's credibility finding was not against the manifest weight of the evidence, and it did not abuse its discretion in denying the petition to restrict respondent's parenting time. Further, the court's denial of the petition to modify was not contrary to the best interests of the children. Affirmed.

¶ 2    Petitioner, Sari Grossman, appeals from the circuit court's September 4, 2025, order disposing of several motions. She contends that the court erred by (1) failing to analyze her request for a reduction of respondent's, Jeffery Rothbart, parenting time under both the restriction and best-interests standards; (2) finding that respondent was a credible witness; (3) determining that she did not meet her burden showing that respondent's parenting time should be restricted; and (4) failing to modify respondent's parenting time based on the best-interest standard. We conclude the court did not err in finding respondent credible and in refusing to restrict his parenting time.

Moreover, we conclude that the circuit court's denial of the petition to modify was not against the manifest weight of the evidence.

¶ 3                                    I. BACKGROUND

¶ 4       On October 9, 2020, the circuit court entered judgment dissolving the parties' marriage. At the time of dissolution, the parties shared three minor children, M.R. (born 11/27/2010), N.R. (born 9/12/2013), and E.R. (born 4/15/2015). On June 9, 2020, an allocation judgment ("AJ") was entered pertaining to the parental responsibilities and parenting plan for the three children. The AJ provided respondent with parenting time every other weekend from Thursday (immediately after school or, if there was no school, at 5 p.m.) to Monday (when school began or, if there was no school, at 9 a.m.); the Thursday before petitioner's weekend either beginning after school or, if no school, at 5 p.m. until Friday when school began or at 9 a.m. if there was no school; and each Monday after school (or at 4 p.m. if there was no school) until 7 p.m. The children resided with petitioner outside of this time. The parties are required to use their best efforts to make joint major decisions; however, petitioner would make a final decision after three weeks of an impasse, and, if a child visited a therapist, the parties agreed to cooperate with the therapist and meet with him or her upon request.

¶ 5       During pre- and post-decree divorce litigation, petitioner obtained three different orders of protection (OP) against respondent. Most recently, petitioner sought an OP on June 4, 2024, in response to an incident that occurred on Mother's Day, where respondent sent text messages to petitioner in a group chat containing the parties' three minor children. Within the messages, respondent used profanity and threatened to call police on petitioner if she was even one minute late for a custody exchange. Respondent used the children as a conduit to convey his messages to petitioner. Petitioner testified that the children were so afraid, fearful, and fidgety in response to

the messages they received that they got in the car and waited for petitioner "well before it was time to go." On September 13, 2024, the circuit court entered a two-year plenary OP, finding that respondent engaged in a pattern of inappropriate statements and, ultimately, harassment and abuse, when respondent used his minor children to threaten petitioner's arrest.

¶ 6 New post-decree litigation began on July 16, 2024, with a petition to restrict respondent's parenting time ("petition to restrict"). On July 22, 2024, Sally Lichter was appointed as guardian *ad litem* (GAL). In between July 2024 and September 4, 2025 (the date of the appealed order), 15 motions were filed and 27 orders were entered by the circuit court. Of note, on August 30, 2024, petitioner filed a petition to modify respondent's parenting time and other provisions of the allocation judgment ("petition to modify") based on the children's best interests. In an order filed on March 17, 2025, the court noted it would be addressing both the petition to modify and petition to restrict at the June 30, 2025, hearing. On March 28, 2025, petitioner sought to modify the AJ regarding extracurricular activities.

¶ 7 On April 3, 2025, petitioner filed an emergency motion to suspend and restrict respondent's parenting time regarding E.R. Petitioner argued that respondent was harassing and disparaging E.R. about her physical appearance, and E.R.'s therapist was already concerned about E.R.'s low self-esteem, lack of confidence, and risk of developing an eating disorder. Petitioner asserted that, following spring break, E.R. returned to petitioner's house upset because respondent disparaged her at dinner in front of her brothers regarding her weight. Petitioner argued that M.R. and N.R. emulate respondent's behavior to such a degree that, following this dinner, E.R. had to do a "weigh-in." On April 4, 2025, an agreed order suspended respondent's parenting time and precluded respondent from initiating contact with E.R. until April 14, 2025. Then, on April 14, 17, and 21, respondent would regain parenting time after school until 7 p.m. Thereafter, on April 22, 2025, the

parties agreed to temporarily modify respondent's parenting time with E.R.—Mondays after school to 7 p.m., Thursday after school until school drop-off on Friday morning, and alternating Saturdays from 6 p.m. until Sunday at 6 p.m. This was the parenting schedule for E.R. at the time of the hearing on the foregoing motions on June 30, 2025, and July 1, 2025.

¶ 8     Lichter issued her report on June 17, 2025. In the report, Lichter recounted petitioner's tumultuous relationship with respondent. Regarding the children, petitioner expressed that M.R. has been parentified, as he tries to protect both his parents and siblings, yet he is tasked with enforcing the rules at respondent's residence. Petitioner attempted to put M.R. in therapy but she believed that respondent bullied the therapist into discontinuing appointments, and respondent pushed M.R. out of wanting therapy. Petitioner reported taking E.R. to see a therapist, Roberta Auslander. Respondent is not supportive of this. Petitioner opined that respondent treats M.R., and to some extent N.R., like friends and not children. For example, petitioner recounted that respondent texted a picture to N.R. of a sign placed on his door while respondent hosted a party, which said, "no fucking in here." Respondent denied sending the picture; rather, he opined that his friend took the picture and showed it to the children. Overall, petitioner reported that the children return from respondent's house dysregulated, taking up to 48 hours to return to normal. Petitioner also believed that the children feared retribution from respondent whether by disconnecting their cell phones or by him calling the police on petitioner. She noted that the children also feared speaking out against respondent, even to tell the truth.

¶ 9     Petitioner reported being concerned, especially for E.R., because of developing mental health issues surrounding food and her "weight issue." E.R.'s weight was reportedly at the "higher end of normal." At the time of the divorce, petitioner recounted that E.R. began sneaking food, making bad food choices, and exhibiting an emotional connection to food. Petitioner described

that respondent makes comments generally and to E.R. about her weight but fights E.R.'s participation in dance lessons. Specifically, respondent called E.R. fat and gross in an Our Family Wizard (OFW) message to petitioner. Petitioner stated N.R. also made comments about E.R. being fat. In April 2025 (over spring break), respondent noted that he had a "long heart to heart conversation" with E.R. regarding health concerns. Petitioner reported that, after returning from spring break, M.R. and N.R. locked E.R. in the bathroom and forced her to get on the scale and weigh-in. This was immediately after dinner with respondent, where he discussed E.R.'s weight. In response to these incidents, respondent's parenting time was reduced. Thereafter, petitioner reported to Lichter that E.R. had reduced anxiety-driven eating, felt more comfortable, and appeared happy and confident.

¶ 10   Lichter also interviewed respondent. He reported that both he and petitioner are guilty of putting M.R. in the middle of disputes. Regarding his temperament, he indicated he had been in therapy for five years, working on impulsiveness and anger issues. He opined that his communication with petitioner was "bad," but a therapist would not improve that; he and petitioner needed to "do better." He believed that he and petitioner were "two people that hate each other and the kids are merely pawns." However, respondent later testified that he had remorse about how he handled the Mother's Day situation. He concluded that he improperly emulated petitioner's behavior and "that was a mistake." Lichter noted that respondent's inappropriate statements and behavior persisted despite his alleged therapy; specifically, Lichter described that respondent attempted to have M.R. and N.R. persuade E.R. to contact him after his parenting time was suspended; he continued to display anger towards E.R.'s therapist despite knowing it impacted E.R.; and he reportedly exhibited anger towards restaurant servers.

¶ 11 Respondent indicated to Lichter that he is the parent that looks out for the children's safety and expresses love towards them. For example, he prevented N.R. from participating in tackle football, despite N.R.'s interest, due to safety concerns, and he cuddled and showed love to the children more than petitioner. As to respondent's relationship with E.R.'s therapist, he wished to discontinue E.R.'s therapy with Dr. Auslander because she is out of network, not helpful, and he believed that E.R. hated her.

¶ 12 Respondent was upset that petitioner was attempting to modify or restrict his parenting time, as Monday parenting time was when he was able to do activities with the children that petitioner did not want to engage in. For example, respondent had a personal trainer for E.R. on Mondays, but it was, ultimately, discontinued. Regarding E.R.'s health and weight, respondent complained of E.R.'s inability to walk across a college campus or hike down the Grand Canyon. Respondent believed that petitioner was to blame for E.R.'s decline in health because she "is eating her feelings," "eats an obscene amount of food," eats only junk food, "is only growing horizontally," and lacks coping skills and self-confidence. E.R. reported to Lichter that respondent called her overweight; respondent denied that allegation. Respondent requested a mental and physical evaluation be done on E.R., but not by her current therapist or physician. Lichter expressed concern about respondent's statements about E.R.'s health and warned it may cause disordered eating. Instead, Lichter recommended eliminating unhealthy snacks from respondent's household and implementing daily exercise with E.R.; however, respondent reportedly did not have time for this.

¶ 13 Addressing the children's interviews, Lichter noted that they "volunteered" information and their responses seemed coached. The children did not want to speak poorly about respondent. For example, E.R. was protective of respondent and made sure to follow any positive comments

about petitioner, with equitable comments about respondent. Lichter noted that E.R. was a "people pleaser" due to self-esteem concerns, and she had previously disclosed that she felt "invisible" at respondent's house. Lichter reported that E.R. does not confront respondent at his house but was working with her therapist to discover ways to connect with respondent.

¶ 14    As related to parenting time, Lichter recommended that respondent's time be reduced to every other Friday from after school until school drop-off Monday morning and Tuesday nights beginning after school until school drop-off Wednesday morning. Lichter noted that the present schedule allotting respondent Monday evenings and a Thursday overnight did not work well and created a long weekend. She recommended a Tuesday overnight to replace Monday dinners and Thursday overnight. To justify the change, Lichter cited high conflict communication between the parties, respondent's refusal to cooperate with adults who are important to the children, and respondent's inability to consider the children's needs and wants above his own.

¶ 15    In response to Lichter's report, respondent sent six emails disputing the contents of the report and challenging her reputation. On July 20, 2025, Lichter filed a supplemental report. There, she detailed respondent's disparaging remarks used in his email correspondence and highlighted his demands that she reconsider the recommendations made in her initial report "or lose [her] career." Further, Lichter recounted respondent's email correspondence with E.R.'s therapist, where he threatened to report Dr. Auslander to the licensing board unless she stopped seeing E.R. and cancelled his outstanding balance.

¶ 16    In this new report, Lichter recommended a further reduction in parenting time. For E.R., Lichter recommended parenting time from Tuesdays after school to Wednesday at school drop-off and alternating Saturdays from 6 p.m. until Sundays at 6 p.m. Lichter recommended this schedule be implemented until E.R.'s therapist believed E.R. was ready for increased time. For M.R. and

N.R., Lichter recommended parenting time from Tuesdays after school to Wednesdays at school drop-off and alternating Fridays from 6 p.m. until Sunday at 6 p.m. Lichter revised her initial recommendation because of respondent's inability to regulate and stabilize his emotions and his failure to take responsibility for his parenting and communication issues. Moreover, Lichter cited E.R.'s improvement in emotional regulation, confidence, and decreased emotional snacking since the reduced parenting-time schedule had been implemented.

¶ 17    On June 30, and July 1, 2025, a hearing was held on several motions filed by the parties. In its order, the court specifically noted that it was resolving the petition to modify. The petition to restrict was not specifically listed at the beginning of the order; however, restricting respondent's parenting time was discussed at the hearing and referenced throughout the order. In fact, at the beginning of the hearing, the circuit court was reminded of the petition to restrict and stated that it would address this petition. The court indicated that it got the pleadings "mixed up" and added the petition to restrict to its "tally" of reviewable petitions.

¶ 18    At the hearing, respondent testified that he was M.R., N.R., and E.R.'s father, and he and petitioner divorced in 2020. Respondent testified he had parenting time alternating weekends from Thursday after school until Monday at 7 p.m. During the weeks he does not have weekend parenting time, he still has the children on Mondays after school from 4 p.m. until 7 p.m., and Thursdays after school until Friday morning. Respondent indicated that he works during the week, and sometimes on weekends, but, during his parenting time, he is often available to his children in his office. Even when it is not his parenting time, respondent likes to communicate with his children every morning before school and at night.

¶ 19    Respondent testified that, overall, he was dissatisfied with Lichter. He opined that Lichter failed to investigate several claims, especially regarding Dr. Auslander, and misrepresented

statements made to her in the report. After Lichter released her report, respondent sent several emails to her, notifying her that her "sexual orientation should be disqualifying" and that her report was "materially lacking in investigation and quality and was biased and broke all of the rules of a GAL." Respondent also threatened to report Lichter to the Attorney Registration and Disciplinary Commission and refused to pay for her services without a court order. At the hearing, respondent affirmed that the substance of his emails was appropriate, and nothing in Lichter's report caused him to question his parenting skills. However, he eventually admitted that he is an "abrasive person" and has a problem with the form in which he communicates but his communication difficulty does not apply to his children, only the adults he feels have wronged him.

¶ 20      Respondent noted that he had "two-and-a-half" concerns he felt Lichter was not addressing regarding E.R.—issues with her weight, which impacted her self-confidence; her lack of friendships; and E.R.'s discomfort in secondhand clothing. Regarding E.R.'s weight, respondent affirmed that he believed E.R. was overweight and did not get the right kind of exercise. E.R.'s participation in dance, specifically, was not a rigorous enough form of exercise—"[d]ance is not exercise. This is a stupid expense." Nonetheless, E.R. enjoyed the dance classes. Respondent, ultimately, signed E.R. up for personal training at Pulse. However, E.R.'s participation there was also not rigorous enough to support her health requirements, so respondent terminated the training sessions, despite E.R.'s somewhat enjoyment ("like ish") of the sessions. Respondent then moved E.R. to another personal training location, which continued for three to four weeks before the sessions were terminated because E.R. disliked them. Despite respondent's concerns about E.R.'s health, he affirmed that he had not discussed his concerns with E.R.'s pediatrician, as he disliked the pediatrician and believed that petitioner had had a sexual relationship with E.R.'s doctor.

¶ 21    Respondent conveyed his concerns to Lichter regarding E.R.'s health during spring break. During the vacation, respondent reported, E.R. struggled with the "normal" amount of walking that occurred, and E.R. refused to do a one-hour hike at the Grand Canyon. After returning from vacation, respondent took the children out to dinner and respondent conveyed to E.R. that he was concerned about her health. E.R. opined that her new personal trainer was too hard, and respondent stated the hard work was good for her. After dinner, respondent discovered M.R. and N.R. in the bathroom with E.R., trying to give her a weigh-in. Respondent testified that Lichter's claims that E.R. may develop an eating disorder due to the communication around her weight was "a complete lie." Following this incident, respondent's parenting time with E.R. was suspended, and he was very upset about the decision. Nevertheless, he testified that he read several internet articles about encouraging healthy choices and intended to implement more healthy choices following E.R.'s return from camp.

¶ 22    Regarding N.R. and extracurriculars, respondent testified that N.R. participated in park district basketball and club basketball (with coach, TJ). Respondent wanted to remove N.R. from club basketball because he did not like TJ or the way he spoke to the children, he found TJ's schedule to be problematic, and he believed that petitioner's practice of leaving two children home during N.R.'s games was inappropriate because games could last up to six hours. According to respondent, if it were up to him, N.R. would not participate in club basketball with TJ. N.R. really enjoyed club basketball and TJ.

¶ 23    Next, respondent expressed his dissatisfaction with E.R.'s therapist, Dr. Auslander. He believed that therapy was "BS" and that Dr. Auslander and petitioner disparaged him to E.R. Accordingly, he refused to participate in E.R.'s therapy or take her to therapy during his parenting time. Moreover, he believed that E.R. did not like her therapist, as she was too old and had not

connected to E.R., despite E.R.'s statements, reflected in the GAL report, that she thought Dr. Auslander was fine. Prior to the June 30 hearing, respondent threatened to report Dr. Auslander to her licensing board if she did not resign from E.R.'s case. When asked if respondent thought his behavior was appropriate, he said: "Yes." In fact, respondent had "no regrets" concerning his communication with Dr. Auslander, and it was not respondent's "highest priority" to consider how his communication with Dr. Auslander impacted her relationship with E.R.

¶ 24　Over the two-day hearing, petitioner also testified. She affirmed that she was M.R., N.R., and E.R.'s mother. She divorced respondent, and their only form of communication was on OFW, as she had an OP against respondent. She believed that her communication with respondent was not productive, as it was "aggressive, it is usually harassing, and it is unkind." Petitioner testified that the children, especially N.R., were emulating respondent's behavior—speaking in an aggressive manner, cursing, and breaking rules. Since the conclusion of the divorce and entry of the AJ, the parenting schedule had not been modified (apart from the temporary modification regarding E.R.), and she had not discussed the children's parenting schedule preferences with them. She noticed, however, that since the temporary order modifying E.R.'s parenting time with respondent, E.R. had been calmer, her anxiety was reduced, and her demeanor was lighter.

¶ 25　Petitioner testified that all three children have cell phones and communicate with respondent from those phones. Petitioner does not restrict the children's communication with respondent unless she overhears something inappropriate. After spring break, petitioner asked E.R. to get off the phone after she overheard respondent crying to E.R. on the phone—he was upset and conveying to E.R. that restricting his parenting time was not what he wanted but what petitioner and Lichter wanted. E.R. was visibly upset by the phone call.

¶ 26     Petitioner further testified about the children's extracurricular activities. She noted that N.R. participated in basketball with the park district and with TJ. N.R. has been doing this since 2021. He loved TJ and smiled whenever he went to practices. Petitioner stated she received messages from respondent regarding N.R.'s participation in activities, indicating that he "will protest the activity [TJ basketball] into perpetuity." As to E.R., she participated in dance. E.R. appeared excited about dance, and petitioner encouraged her to do dance because it allowed her to get exercise and socialize. Petitioner was concerned that respondent would forbid E.R. from participating in dance and that would make her sad.

¶ 27     As to concerns about E.R.'s weight, petitioner testified that she would like E.R. to be stronger, as she believed it would help "her mind and her body," but she did not have any concerns about E.R.'s weight. Petitioner tried to present healthy food options to all her children, but she did not believe that healthy options were always presented outside of her home. Also, petitioner overheard respondent make disparaging remarks to E.R. regarding her weight. For instance, when E.R. asked respondent about obtaining swimsuits from his house for camp, and respondent asked for the size, he also commented "that is really big, [E.R.]." Petitioner could tell that E.R. was upset by this statement.

¶ 28     Petitioner also encouraged E.R. to self-advocate and make healthy choices for her mental health. To encourage positive mental health, petitioner hired E.R. a therapist. Petitioner indicated that respondent agreed to have E.R. see a therapist but he "wanted no part of it" and would not take E.R. to therapy during his parenting time. E.R. was aware of this; however, petitioner had never overheard respondent negatively discussing Dr. Auslander to E.R. Petitioner believed that Dr. Auslander was helping E.R.; nonetheless, she was concerned that Dr. Auslander would withdraw from being E.R.'s therapist because of respondent's behavior.

¶ 29　Lichter also testified at the hearing. Therein, she reiterated the findings of her report and noted that she did not make any intentional misrepresentations. Lichter appended to her report respondent's communications with her and Dr. Auslander "so the Court could fully understand the flavor of [respondent]'s E-mails that he is vindictive against professionals related to the family[.]"

¶ 30　Regarding the temporary suspension of respondent's parenting time with E.R., Lichter recommended the suspension based on the issues with spring break and the "weigh-in" incident thereafter. Lichter noted that E.R. seemed dysregulated and very upset. Also considered in writing her report, Lichter received communications showing M.R. and N.R. pressuring E.R. to contact respondent because he was "extremely emotional" after his parenting time was suspended. Lichter did not think respondent's reaction was appropriate, especially in front of his two children. Overall, Lichter believed that therapy would be beneficial for all the children, but especially N.R., because weeks after the "weigh-in" incident he had trouble displaying empathy and still thought the incident was "the funniest thing." She, however, did not make this recommendation in her report. Lichter believed that petitioner was better equipped to address these concerns.

¶ 31　Regarding respondent's general difficulty with impulse control and anger, Lichter noted that respondent's behavior impacted the children, especially E.R., as she knows that respondent does not support her work in therapy. During Lichter's investigation, she did not see an improvement in respondent's impulse control or anger issues; in fact, respondent's behavior was worse after she issued her initial report. Further, she did not believe that respondent could cooperate with Dr. Auslander. Lichter was also concerned by respondent's detached parenting style, as he was available to his children if they needed him, but he was less engaged. She noted that the children were more isolated at respondent's house and just "doing their own thing."

¶ 32    As to the children's relationship with other adults and activities, Lichter was concerned because respondent wanted to eliminate the people and things that were important to the children without speaking to them. Respondent appeared to let his opinions dominate over the children's interests; however, Lichter indicated that respondent appeared to shield the children from the extent of his opinions. Lichter had no evidence that respondent discussed Dr. Auslander with E.R. in a negative light, after the initial report.

¶ 33    Lichter, ultimately, revised her report and recommended parenting schedule because she witnessed E.R. improve on the more restricted schedule. However, Lichter was impeached with her earlier deposition testimony that she did not learn anything new about E.R. between the filing of her initial and supplemental report. Lichter also stated that she revised her report because she realized, based on respondent's response to the report, that he was not going to utilize the report as a tool to improve his parenting style but, rather, he would reject the report whole cloth. Lichter did not reinterview the parties or the children before revising her report and testified she did not issue the supplemental report to retaliate against respondent. Lichter reaffirmed at the hearing that her recommendations in the supplemental report were appropriate, as respondent's testimony was not self-reflective as to the discussed parenting concerns. However, she admitted that a restriction in parenting time required a finding of serious endangerment, which was not discussed in her initial report.

¶ 34    On September 4, 2025, the circuit court issued a 15-page detailed written order. Therein, the court found that the supplemental report may have been reactive, but important. It stated that respondent's messages to petitioner on OFW were "inappropriate, disrespectful, and accusatory," and his reaction to Lichter's report was "poor," despite failing to read the document in its entirety. Respondent's behavior towards others was "very concerning"; he showed "complete disdain"

toward petitioner and Dr. Auslander, and there was evidence that the children were aware of this. Evidence showed that respondent "does not hide his comments about [petitioner] or any other adult he dislikes to the children." Further, the court considered respondent's admission that he was an abrasive person who directed his ire towards adults he felt wronged him. The court stated, it "has had ample opportunity to monitor [respondent's] disposition, observe his bullying nature, listen to his nonstop comments and witness his disrespectful arrogance in open Court." The court noted it never received evidence that respondent was participating in anger-management or impulse-control classes, and it was surprising that respondent would lash out against Lichter, if he were involved in those classes. The court believed that respondent needed assistance with his behavior because his constant communication with the children during petitioner's parenting time was disruptive and his communication with Dr. Auslander was not in E.R.'s best interests. Nevertheless, the court found respondent, and all other witnesses, credible.

¶ 35 Next, the court found that the minor children volunteered their position in favor of equal parenting time at the behest of respondent. The court noted it was "undisputed" that E.R. was experiencing issues related to food and her mental health.  In the court's assessment, petitioner did "essentially all" the caretaking, the children work better together at her house, petitioner managed the extracurricular schedule, and petitioner showed she was more willing to place the needs of the children above her own. Conversely, the court expressed concerns about respondent's mental health and implored him to make his children's needs a priority and avoid taking his aggression out on the adults in his children's lives. The court found that respondent demonstrated that he placed his own needs above his children by not taking them to appointments and activities and not wanting them to participate in an activity because of his own misgivings. Also, respondent did not care how his actions towards the adults in his children's lives impacted his children.

¶ 36   In sum, the court ordered an adjustment in respondent's decision-making responsibility for extracurriculars, imposed a parenting coordinator, and referred respondent to anger-management counseling because respondent's conduct toward petitioner—communicating with his children about the potential arrest of petitioner—"seriously endanger[ed] the minor children's mental health" and "significantly impaired the child's emotional development." However, the court refused to restrict or modify respondent's parenting time, as respondent's behavior "has not impacted the children enough to rise to the level of a restriction in parenting time," and there had not been a substantial change in circumstances to warrant a modification of parenting time. Accordingly, the court reinstated respondent's parenting time as to all the children to alternating weekends from Thursday after school until Monday at 7 p.m., and, during the weeks he does not have weekend parenting time, Mondays after school from 4 p.m. until 7 p.m., and Thursdays after school until Friday morning.

¶ 37   Petitioner timely appealed, seeking reversal of the September 4 order and any other underlying orders.

¶ 38                                    II. ANALYSIS

¶ 39   On appeal, petitioner argues that the circuit court erred where, (1) it failed to assess her petition to modify respondent's parenting time under the best-interests standard; (2) it found that respondent was a credible witness; (3) it concluded that she failed to meet her burden showing respondent's parenting time should be restricted; and (4) it failed to find a substantial change in circumstances that warranted a modification of respondent's parenting time under the best-interests standard.

¶ 40   Prior to discussing petitioner's arguments, we must address the timeliness of this decision. This case is designated as "accelerated" pursuant to Illinois Supreme Court Rule 311(a) (eff. July

1, 2018), because it involves a matter affecting the allocation of parenting time. Rule 311(a)(5) provides, in relevant part, that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." *Id*. In this case, petitioner filed her notice of appeal on October 1, 2025. Thus, the 150-day period to issue our decision expired on March 2, 2025. We note, however, that petitioner was allowed to supplement the record with an additional motion and the record materials from case Nos. 24-OP-1377, 22-OP-226, 20-OP-028, and 19-D-776, and, on December 10, 2025, respondent was granted an extension of time to file his responsive brief. As such, a revised briefing schedule was entered, allowing respondent until December 31, 2025, to file his brief and petitioner until January 14, 2026, to file her reply brief. Importantly, both parties also requested oral argument in this case, and the case was docketed and heard on March 12, 2026. As a result of the foregoing, the case was not submitted for a decision until after oral argument. Since the case was not ready for disposition until after March 12, 2026, we find good cause for issuing our decision beyond the 150-day deadline. See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26 (finding good cause where the briefs were filed after the initial briefing deadlines but one week before the 150-day deadline); *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 53 (finding good cause where accommodating requests for oral argument delayed the filing of the decision).

¶ 41                                      A. Jurisdiction

¶ 42      Next, we must address whether we have jurisdiction to hear this appeal. Respondent argues that we lack jurisdiction and must dismiss the appeal because, contrary to local rule, petitioner failed to confirm that no other post-dissolution matter was pending in the circuit court at the time of her appeal. See Ill. App. Ct., Second Dist., R. 114 (Oct. 4, 2022). In particular, respondent argues that two matters were pending at the time of the appeal: (1) a petition for rule to show cause

filed August 8, 2025, and (2) the petition to restrict filed July 16, 2024. Specifically, as to the petition to restrict, respondent alleges that the court made no mention of the petition in the September 4 order being appealed; thus, there is no final order to appeal, and its unresolved nature impacts the court's ability to finally resolve the petition to modify, as the petition to restrict and petition to modify seek to alter identical provisions regarding respondent's parenting time. Moreover, respondent argues that petitioner failed to show how Illinois Supreme Court Rule 304(b)(6) was the basis for jurisdiction, where there was no final order on the two unadjudicated petitions. Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016).

¶ 43    Petitioner asserts that respondent's reliance on the local rules for jurisdiction is misplaced. Further, petitioner argues that her jurisdictional statement complies with Illinois Supreme Court Rule 341(h)(4)(ii) and establishes jurisdiction pursuant to Rule 304(b)(6). See *id*.; Ill. S. Ct. R. 341(h)(4)(ii) (eff. Oct. 1, 2020). Specifically, petitioner asserts that the circuit court's statements, findings, final order, and the parties' actions throughout the proceeding make clear that both the petition to restrict and petition to modify were finally resolved. We agree with petitioner; we have jurisdiction to address this appeal.

¶ 44    First, petitioner's compliance or noncompliance with Local Rule 114 does not strip this court of jurisdiction. Illinois Supreme Court Rule 22(h) (eff. Jan. 1, 2026) authorizes appellate courts to adopt local rules governing criminal and civil cases within their jurisdiction. These rules, however, must be consistent with existing statutes and supreme court rules. *Id.* It is well-settled that local rules may not conflict with supreme court rules, change the substantive law, or impose additional substantive burdens on litigants. *Vision Point of Sale, Inc. v. Haas*, 226 Ill. 2d 334, 357 (2007). Local Rule 114 does not confer jurisdiction, nor restrict the court's jurisdiction. See Ill. App. Ct., Second Dist., R. 114 (Oct. 4, 2022).

¶ 45    Generally, our jurisdiction is limited to the review of appeals from final judgments, unless otherwise permitted under the supreme court rules or by statute. *Puleo v. McGladrey & Pullen*, 315 Ill. App. 3d 1041, 1043 (2000) ("Appellate jurisdiction is restricted to reviewing final judgments unless the order to be reviewed comes within one of the exceptions for interlocutory orders specified by our supreme court."). Rule 304(b)(6) is one such exception that allows for the interlocutory appeal of child custody or parental responsibility allocation orders. See Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016). Thus, petitioner properly established that this court has jurisdiction. Petitioner's order appealed here, relating to the restriction or modification of respondent's parental responsibilities, which includes parenting time, falls within Rule 304(b)(6). See 750 ILCS 5/600 *et seq*. (West 2022).  Accordingly, a final order as to all the claims raised in the case is not required. Ill. S. Ct. R. 304(a), (b)(6) (eff. Mar. 8, 2016). Rather, it is only necessary that the circuit court addressed both the petition to restrict and petition to modify because resolution of one, without the other, would call into question the finality of the parental custody order. Here, however, this is not an issue. Although the circuit court failed to expressly mention in its order that it was addressing both the petition to restrict and the petition to modify, a thorough reading of the court's September 4 order, the March 17, 2025, setting order, and the hearing transcripts make clear that the court addressed both petitions. For instance, the court expressly addressed petitioner's petition to modify; however, it also found that respondent's behavior "has not impacted the children enough to rise to the level of a restriction in parenting time." The court was even reminded in opening remarks that it was addressing the petition to restrict during the hearing and made note of such. Additionally, in count II of the petition to restrict, petitioner asked the court to impose anger-management and parenting counseling on respondent. Respondent concedes that the petition to restrict was addressed, insomuch as "the Court effectively granted the relief [petitioner] requested

in Count II of her Petitioner to Restrict." Finally, in an order filed on March 17, 2025, the court expressly noted it would be addressing both petitions at the June 30 hearing. Accordingly, we agree with petitioner that we have jurisdiction to hear the present appeal.

¶ 46                                    B. Credible Witness

¶ 47    Turning to the merits of the appeal, petitioner first asserts that the circuit court's finding that respondent was a credible witness was against the manifest weight of the evidence, as his testimony was contradictory; his demeanor was "frequently reactive, hyperbolic, illogical, hostile, and often reached broad sweeping conclusions on important issues"; and he evinced an unwillingness to follow court orders. In response, respondent argues that the circuit court was in the best position to judge credibility, thus, this court should not substitute its judgment for that of the circuit court. We agree with respondent.

¶ 48    Credibility determinations are within the sole purview of the trier of fact, and we will not substitute our judgment for that of the circuit court. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 69; *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 29. "A reviewing court will defer to the trial court's findings because the trial court, 'by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to assess their credibility.' " *In re Marriage of Manker*, 35 Ill. App. 3d 465, 477 (2007) (quoting *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 980 (2006)). A court's finding of witness credibility may only be overturned if it is against the manifest weight of the evidence. *In re Marriage of Meadow*, 256 Ill. App. 3d 115, 117 (1993). "A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the judgment is arbitrary, unreasonable, or not based on the evidence." *Vician*, 2016 IL App (2d) 160022, ¶ 27. Accordingly, we will affirm the judgment if the record contains evidence to support the circuit court's findings. *Id*.

¶ 49    Here, the court found that all witnesses were credible, including respondent. The circuit court had years of experience working with petitioner and respondent, and, in the last year working with the parties, the court issued 27 orders and reviewed 15 motions or petitions. With this experience in mind, the court found that respondent was a credible witness.

¶ 50    Petitioner asserts that respondent should not have been found to be credible because of his abrasive personality and temperament, citing *In re Marriage of Stoker*, 2021 IL App (5th) 200301, ¶ 70, and inability to follow court orders. However, *Stoker* does not stand for the proposition for which it has been cited. There, the reviewing court did not evaluate the temperaments of the parties and overturn the circuit court's credibility finding; rather, the *Stoker* court recited the following axiom: "It is well established that credibility determinations should be left to the trial court, as it is in the best position to observe the personalities and temperaments of the parties and assess their relative credibility when there is conflicting testimony on issues of fact." *Id*. Here, the court followed this well-settled principle. The court noted the extent to which it had worked with the parties; the temperament of the witnesses; and behaviors the parties exhibited that negatively or positively impacted their children, when it considered the credibility of the witnesses. The court witnessed respondent's testimony and reviewed his communications with petitioner, the GAL, and Dr. Auslander. The court was also familiar with respondent's communications with petitioner before and after the entry of a plenary OP resulting from the Mother's Day incident. The fact that the circuit court found respondent to be credible is not invalidated by the fact that the court also remarked on respondent's bullying nature, constant comments, and disrespectful arrogance. A witness's believability and honesty is not synonymous with his or her likability. Rather, in spite of these negative characteristics of respondent, the court *still* found him credible. It was not unreasonable for the court to find respondent credible, despite

his surly nature. In fact, his unvarnished honesty could have contributed to the court finding him credible.

¶ 51     Next, petitioner asserts that respondent offered baseless opinions to the court and presented contradictory evidence, which should have negatively impacted his credibility. First, the court heard evidence about respondent's opinions as to petitioner, Dr. Auslander, TJ, and the GAL. The court was free to accept or reject all or some of respondent's opinions about those individuals. See *In re Marriage of Patel and Sines-Patel*, 2013 IL App (1st) 112571, ¶ 78 (noting that it is within the function of the court to accept or reject witness testimony). Here, it is evident that the court rejected some of respondent's opinions based on its written findings and because it granted several forms of relief in petitioner's favor. Nonetheless, the court's apparent rejection of respondent's opinions regarding the adults in his children's lives does not invalidate the court's finding that, overall, respondent was a credible witness. *Id.*

¶ 52     As to any potential contradictory statements made by respondent, it was not unreasonable for the court to find respondent credible despite any contradictions. Here, petitioner highlights instances where the court questioned respondent's credibility—noting that respondent testified that he did not initiate conversations with the children about parenting time yet, in an email, respondent indicated that he did initiate a conversation on that topic, and respondent's testimony contradicted another credible witness. We emphasize that it is not this court's role to second-guess a circuit court's resolution of conflicts between contradictory evidence, nor does the conflicting nature of the evidence render the outcome unreasonable. *Chicago Title Land Trust Co. v. JS II, LLC*, 2012 IL App (1st) 063420, ¶ 31. Accordingly, we will not reweigh the evidence here.

¶ 53     Finally, the court discussed evidence that supports its finding that respondent was a credible witness. Although the court recognized respondent's abrasive nature, it also believed respondent's

testimony that his ire was directed at the "adults that [respondent] feels have wronged him." The court recognized that the initial GAL report did not find any evidence of physical violence, serious endangerment to the children, or pattern of abuse against the children. Lichter also concluded that respondent appeared to shield his children from the extent of his opinions. The circuit court was in the best position to judge the credibility of respondent because it was able to hear his testimony, observe his demeanor, and witness his conduct. *In re Commitment of Sandry,* 367 Ill App. 3d 949, 980 (2006). Here, there is sufficient evidence to support the circuit court's finding that respondent was credible. Overall, petitioner presents no compelling reason for us to reweigh respondent's testimony and substitute our judgment for that of the circuit court.

¶ 54                                    C. Petition to Modify

¶ 55     Next, as to the petition to modify, petitioner asserts that the circuit court erred when it denied her petition. Specifically, petitioner argues that the circuit court improperly determined that there was not a substantial change in circumstances that warranted a reduction of respondent's parenting time, and the court also failed to address the modification of respondent's parenting time under the best-interests standard. See 750 ILCS 5/610.5(c) (West 2022). Alternatively, petitioner asserts that, to the extent the best-interests standard was addressed, the court's findings were contrary to the manifest weight of the evidence. Respondent argues that petitioner's arguments are founded on mistaken premises, contradict themselves, improperly go beyond the relief requested in the petition to modify, violate Rule 341 and should be forfeited, and have no merit.

¶ 56     Of note, the record and findings of the court, regarding the petition to modify and petition to restrict, are not clear. As indicated throughout this disposition, the court reviewed multiple pleadings with various standards and burdens of proof, many of which overlap, within the same hearing. As a result, these petitions and their sub-issues were ripe for conflation. We are mindful

of the court's busy docket and pursuit of judicial economy and the complexity of the statutes involved; however, it is essential, in cases such as this, that the court holds each party to his or her appropriate burden and makes specific findings addressing those individualized burdens.

¶ 57 With the foregoing in mind, we are compelled to first address the legal standard by which petitioner's claims should be addressed. Here, the petition to modify is framed as a modification of the AJ and not just a change to parenting time. Both parties also address this issue in terms of requiring a substantial change in circumstances, thus, conceding section 610.5(c) applies. We agree with the application of this standard. See *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶¶ 21-29 (holding that the substantial-change standard set forth in section 610.5(c) of the Act applies to a request for the modification of a parenting plan, including sections relating to parenting time); accord *Reynolds v. Reynolds,* 2025 IL App (2d) 240028, ¶¶ 7, 32 (seeking only to modify parenting time and *not* the parenting plan or allocation judgment). Section 610.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act). (750 ILCS 5/610.5(c) (West 2022)) provides:

"(c) Except in a case concerning the modification of any restriction of parental responsibilities under Section 603.10, the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a *substantial change* has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." (Emphasis added.) *Id*.

¶ 58 The allocation of parenting time and modification of a parenting plan is within the discretion of the circuit court. Accordingly, we provide great deference to the court when reviewing the modification of a parenting plan because it is in the best position to assess witness

credibility and determine the child's best interests. *In re Marriage of Wendy L. D. & George T. D., III*, 2017 IL App (1st) 160098, ¶ 76. We will overturn a court's finding that no substantial change occurred, warranting a change to the parenting plan, under the manifest-weight-of-the-evidence standard. *In re Marriage of Wengielnik*, 2020 IL App (3d) 180533, ¶ 12 (holding that "[w]hen the trial court finds that no substantial change in circumstances has occurred, we review whether the manifest weight of the evidence supports the finding"). Illinois law requires the court to consider the totality of the circumstances. *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 33. A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the judgment is arbitrary, unreasonable, or not based on the evidence. *Vician*, 2016 IL App (2d) 160022, ¶ 27.

¶ 59                    *1. Substantial Change in Circumstances*

¶ 60    Respondent asserts that petitioner's claims have been forfeited because she failed to sufficiently comply with Rule 341. Ill. S. Ct. R. 341 (eff. Oct. 1, 2020). Specifically, respondent asserts that petitioner's brief is disorganized, lacks citation to the record and authority, fails to include a "Statutes Involved" section, and impermissibly cites an unpublished decision. While we agree with respondent in some regards, he also largely places form over function. Petitioner does support each argument with some citations to authority and citations to the record. She also includes the relevant statutes in the appendix of her brief. Overall, any improper citations to authority will be disregarded, and we will not find petitioner's arguments forfeited. See *Chaudhary v. Department of Human Services*, 2021 IL App (2d) 200364, ¶ 37 (noting that forfeiture is a limitation on the parties and not this court; we may "overlook forfeiture and address the merits of an issue to obtain a just result or maintain a sound and uniform body of precedent").

¶ 61　The first prong of section 610.5(c) requires petitioner to show that a substantial change in circumstances has occurred. The court noted that it had ample time throughout these proceedings to "observe [respondent's] bullying nature, listen to his nonstop comments and witness his disrespectful arrogance in open Court ***." Thereafter, the court conflated the petitions, yet, expressly found there had not been a substantial change in circumstances to warrant a modification of parenting time because respondent's behavior had been consistent and "at present, has not impacted the children enough to rise to the level of a restriction in parenting time." We disagree with the court's finding that there has not been a substantial change in circumstances and conclude that respondent's conduct, detailed below, coupled with the court's findings, resulting from the issuance of the plenary order of protection—that respondent seriously endangered the children and significantly impaired their mental health—was more than sufficient to meet the substantial change predicate required in section 610.5(c).

¶ 62　As mentioned in the court's order, on April 3, 2025, petitioner filed an emergency motion to suspend respondent's parenting time. Petitioner filed the motion in response to E.R.'s recounting of her spring break and "weigh-in" thereafter, which left E.R. distraught. Assuming respondent's testimony is credible, the record showed that, after spring break, an incident occurred that concerned respondent and E.R. During the vacation, respondent reported to Lichter that E.R. struggled with the "normal" amount of walking that occurred, and E.R. refused to do a one-hour hike at the Grand Canyon. After returning from vacation, respondent took the children out to dinner and E.R. indicated that her new personal trainer was too hard. Respondent conveyed to E.R. that he was concerned about her health, and he believed the hard work was good for her. After dinner, while respondent was doing laundry, he heard E.R. scream and he, subsequently, found M.R. and N.R. in the bathroom with E.R., trying to give her a "weigh-in." Respondent testified that Lichter's

claims that E.R. may develop an eating disorder due to the communication around her weight was "a complete lie." However, the court found that it was "undisputed" that E.R. was "experiencing some issues as it relates to eating which also coincides with mental health and is currently seeing a therapist," and that E.R. felt invisible at respondent's home. As a result of granting the emergency motion, E.R.'s parenting time with respondent was temporarily reduced after the spring break incidents, and both petitioner and Dr. Auslander reported that E.R. was less anxious and more relaxed after reducing respondent's parenting time.

¶ 63    Thereafter, the court recounted that respondent agreed to suspend his parenting time until April 14, 2025. On April 22, 2025, the parties agreed to temporarily modify respondent's parenting time with E.R.—Mondays after school to 7 p.m., Thursday after school until school drop-off on Friday morning, and alternating Saturdays from 6 p.m. until Sunday at 6 p.m.

¶ 64    The court also noted, between the filing of the AJ and the June 30 hearing, petitioner obtained several OPs against respondent. Closest in time to the hearing, the court entered a plenary OP on September 13, 2024, resulting from the Mother's Day incident. There, respondent messaged his children in a group chat with petitioner and used the children as a conduit to threaten police action against petitioner if she was late for a custody exchange. Petitioner testified that the children were so afraid, fearful, and fidgety in response to the messages they received that they got in the car and waited for petitioner "well before it was time to go." As to this instance, the court found that respondent "*significantly impaired the child[ren]'s emotional development* because he was communicating with the children about the potential arrest of their Mother," and respondent "*seriously endanger[ed] the minor children's mental health*." (Emphases added.) These findings were the basis for the court's order modifying respondent's parental responsibilities, requiring him to complete anger-management counseling, and imposing a parental coordinator. Additionally, the

court found there is evidence that respondent's poor treatment of petitioner has continued. The court classified respondent's attitude towards petitioner as "complete disdain" and noted that evidence showed that the children were aware of respondent's dislike of petitioner; "he does not hide his comments about [petitioner] or any other adult he dislikes to the children."

¶ 65    Finally, as the court found, respondent has refused to take his children to an activity or appointment, or sought discontinuation of an activity, because he does not like the associated adult. For example, since the entry of the AJ (around September 2024), E.R. started seeing Dr. Auslander. Since that time, respondent has made E.R. aware that he will not take her to appointments with Dr. Auslander. Respondent also behaved disdainfully towards Dr. Auslander, and he testified he believed his behavior was appropriate. In fact, respondent had "no regrets" concerning his communication with Dr. Auslander, and it was not respondent's "highest priority" to consider how his communication with Dr. Auslander impacted her relationship with E.R. Respondent also testified that he does not like the children's pediatrician, so he avoids taking his children to the doctor's office "if [he] can avoid it." Further, respondent does not like N.R.'s basketball coach, because of his alleged use of profanity around the children, and respondent testified that, if it were up to him, N.R. would not do basketball with coach TJ. These instances led the court to believe that "[respondent] does not care about the effect of his action towards an adult with *[sic]* have one on *[sic]* of his children."

¶ 66    Despite the myriad of negative behavior cited above, the circuit court did not find there was sufficient evidence of a substantial change in circumstances. We disagree. The record before us establishes a substantial change in circumstances, thus, we conclude that the court unreasonably found that no substantial change in circumstances occurred. First, the respondent weaponized his children, thereby seriously impairing the children's emotional development and seriously

endangering the children's mental health, to harass petitioner, and, in response to this evidence, the circuit court reasonably made changes to respondent's parental responsibilities, ordered him to complete anger-management counseling, and imposed a parenting coordinator. This alone should have substantiated a substantial change in circumstances, and it was unreasonable for the court to find differently.

¶ 67    Nonetheless, there is more evidence that shows the court's determination—that there was no substantial change in circumstances—was unreasonable. The totality of the evidence shows that respondent's "bullying nature" and "disrespectful arrogance" towards other adults in his children's lives has already impacted his children to some degree, even just in the time between the AJ and the June 30 hearing, and respondent does not care about the extent to which his actions *will* impact his children's lives in the future. Specifically, as to E.R., the record reflects that respondent is discouraging healthy outlets for E.R. that she enjoys—therapy and dance—leaving her to deal with her issues in ways only respondent finds acceptable. Further, even taking respondent's account of the spring break incidents as credible, the record reflects that E.R.'s extended presence at respondent's home with respondent and her brothers has negatively impacted her. In light of the foregoing, it is clearly apparent that respondent's behavior has negatively impacted his children, especially E.R., reflecting a substantial change in circumstances.

¶ 68    In total, the circuit court had the foregoing new information in front of it—the court found that respondent's behavior seriously impaired the children's emotional development, determined that respondent's behavior toward petitioner seriously endangered the children's mental health, stated that respondent failed to consider his children's needs above his own, and considered that respondent did not care about the fallout from his behavior towards adults and how it would impact his children—and, thus, unreasonably concluded that respondent's behavior did not constitute a

substantial change in circumstances that warranted further review. We cannot conclude that the court's determinations were reasonable based on the evidence or its own findings. Accordingly, we conclude that respondent's behavior since the entry of the AJ constituted a substantial change in circumstances.

¶ 69                                    *2. Best-Interests Standard*

¶ 70    Petitioner argues that the circuit court failed to apply the best-interests standard to her petition to modify or, alternatively, to the extent that it did apply the best-interests standard, its ruling was against the manifest weight of the evidence. Respondent contends that petitioner's arguments are contradictory and not against the manifest weight of the evidence. We conclude that the court's ruling was not against the manifest weight of the evidence.

¶ 71    Allocation of parenting time within the parenting plan is to be determined based on the children's best interests. 750 ILCS 5/602.7 (West 2022). In determining the children's best interests, the court is required to consider all relevant factors, including: (1) the wishes of each parent; (2) the wishes of the children (taking into account maturity level); (3) the amount of time each parent spent performing caretaking functions for the children in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to the caretaking of the children; (5) the interaction and interrelationship of the children with their parents; (6) the children's adjustment to their home, school, and community; (7) the mental and physical health of all individuals involved; (8) the children's needs; (9) the distance between the parties' residences, transportation, schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) any physical violence or threat of physical violence by the children's parent directed against a child; (12) the willingness and ability of each parent to place the children's

needs ahead of his or her needs; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the children; (14) any occurrence of child abuse; (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender; (16) either parents military family-care plan; and (17) any other relevant factor. *Id.* § 602.7(b).

¶ 72 We find petitioner's arguments that the court failed to address the best-interests standard and that the court's best-interests analysis was against the manifest weight of the evidence to be alternative claims for relief. And although the court did not expressly identify the petitions it considered in assessing the children's best interests, the circuit court broadly considered the best interests of the parties' children in addressing *all* of petitioner's and respondent's claims for relief. Accordingly, we assess whether the court's best-interests findings were against the manifest weight of the evidence and conclude that the circuit court's decision not to modify the parenting plan to reduce respondent's parenting time was not unreasonable.

¶ 73 Petitioner's arguments essentially ask this court to reweigh the evidence and reassess the witnesses' credibility, which we will not do. *In re Marriage of Gorr*, 2025 IL App (3d) 230412, ¶ 46. The court thoroughly considered the presented evidence and drafted a detailed order that corresponds to the factors outlined in section 602.7, including, but not limited to, the parties' and the children's wishes; the mental health of the children, and the behavioral pathologies and self-centered nature of respondent; the ability of the parents to cooperate; the level of conflict between the parties that affects their ability to cooperate; the function of the children, especially at petitioner's house; each parent's past participation in decision-making and caretaking functions; prior agreements and course of conduct between the parents; the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and

the children; the interaction and interrelationship of the children with his or her parents, including respondent's care and concern for his children and his description of positive aspects of his relationship with his children; whether a restriction on parenting time is appropriate; and the willingness and ability of each parent to place the children's needs ahead of his or her needs. Overall, the court found both that respondent was not entitled to equal parenting time and that petitioner failed to meet her burden to further reduce respondent's parenting time within the parenting plan. We will not step into the circuit court's shoes and simply reweigh the evidence or reassess witness credibility because the testimony of the witnesses *could* support a different outcome. *Id.* This record contains sufficient support for the court's findings that modification of the parenting plan to reduce respondent's parenting time was not in the children's best interests.

¶ 74                                    D. Petition to Restrict

¶ 75     Finally, petitioner asserts that the circuit court erred in finding that respondent's parenting time should not be restricted because respondent's behavior towards petitioner and other adults has "not impacted the children enough to rise to the level of a restriction in parenting time." Petitioner claims that respondent exhibited a pattern of behavior that "seriously endangered the minor children's mental, moral, or physical health and/or significantly impaired the minor children's emotional development." In response, respondent asserts that petitioner's arguments are (1) forfeited, as her petition to restrict was not adjudicated; (2) the court knew and properly applied the law; and, (3) even if serious endangerment was found, the court properly exercised discretion in denying the reduction in parenting time and, instead, ordering respondent to attend weekly therapy for anger management. We agree with respondent's third point and conclude that the circuit court did not abuse its discretion in refusing to reduce respondent's parenting time.

¶ 76    For the reasons discussed herein, this issue is not forfeited as it was addressed by the circuit court at the June 30 hearing and included sufficiently in the September 4 order. Additionally, petitioner has made some arguments and cited some relevant case law and portions of the record. See *Chaudhary*, 2021 IL App (2d) 200364, ¶ 37.

¶ 77    As to the merits of the petition to restrict, section 603.10(a) of the Act provides for the restriction of parental responsibility, decision making, and parenting time because of a parent's conduct. 750 ILCS 5/603.10(a)(1), (8) (West 2022). This section states:

> "After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders as necessary to protect the child. Such orders may include, but are not limited to, orders for one or more of the following:
>
> (1) a reduction, elimination, or other adjustment of the parent's decision-making responsibilities or parenting time, or both decision-making responsibilities and parenting time;
>
> ***
>
> (8) requiring a parent to complete a treatment program for perpetrators of abuse, for drug or alcohol abuse, or for other behavior that is the basis for restricting parental responsibilities under this Section[.]" *Id*.

¶ 78    Restricting parenting time is a two-step process. First, the circuit court must find by a preponderance of the evidence that the non-moving parent has "engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development." *Id*. This standard has been described as an "onerous, stringent,

and rigorous," as liberal parenting time is the rule and restrictions are the exception. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 43; *Heldebrandt v. Heldebrandt*, 251 Ill. App. 3d 950, 957, (1993). If the court finds the evidence is sufficient to show serious endangerment to the child, then it must then enter orders necessary to protect the child. *Id*. The court must exercise its discretion in selecting appropriate restrictions to parenting responsibilities to provide for the child's safety and welfare. See 750 ILCS 5/603.10(a)(1)-(9) (West 2022).

¶ 79　Circuit courts are "vested with wide discretion in resolving visitation issues." *In re Marriage of Minix*, 344 Ill. App. 3d 801, 803 (2003). As to the circuit court's finding of serious endangerment, we review whether the court's finding is against the manifest weight of the evidence. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 59. A ruling is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Vician*, 2016 IL App (2d) 160022, ¶ 27. We review the circuit court's determination that certain restrictions are necessary for an abuse of discretion. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 61. The court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *In re Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 54.

¶ 80　The first step in the analysis is to determine whether respondent "engaged in *any* conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development." (Emphasis added.) 750 ILCS 5/603.10(a) (West 2022). Of note, in this part of the analysis, respondent's conduct need not be categorized as specifically impacting decision making or parenting time to support a decision imposing restrictions in those areas. It is enough that he exhibited conduct that either seriously endangered or significantly impaired his children in *any* of these areas. Here, regarding respondent's decision-

making responsibilities, the court found by a preponderance of the evidence that respondent's conduct stemming from the Mother's Day incident "significantly impaired the child[ren]'s emotional development because [respondent] was communicating with the children about the potential arrest of their Mother." Moreover, the court found that "[respondent]'s conduct towards [petitioner] seriously endangers the minor children's mental health." Accordingly, the court determined that petitioner satisfied the seriously-endangered element. Nothing in the record compels us to substitute our judgment for that of the circuit court, as the court's determination was not against the manifest weight of the evidence.

¶ 81 Upon a finding that a parent's conduct seriously endangered his or her children, the court must then determine what restrictions are necessary to protect the children. *Id*. § 603.10(a)(1)-(9). Petitioner argues that the circuit court erred in refusing to reduce respondent's parenting time, especially after finding,

> "(1) E.R. reported she "felt invisible" at [respondent]'s house; (2) [respondent] violated court orders by questioning E.R. about parenting time; (3) the minor children are aware that [respondent] dislikes [petitioner]; (4) [respondent] does not hide his comments about adults he dislikes from the minor children; (5) [respondent] did not take E.R. to therapy during his parenting time; (6) the children volunteered their opinion on parenting time 'to appease' [respondent]; (7) [respondent] does not care about the effect that his actions towards adults have on his children; (8) [respondent] places his needs above the children's needs and he should prioritize the children's needs; (9) [respondent] has directed similar concerning behaviors to his children that he has directed at adults in their lives; (10) [respondent]'s conduct 'significantly impaired the child's emotional development' when

- 35 -

he threatened the children to have [petitioner] arrested on Mother's Day; and (11) [respondent]'s conduct toward [petitioner] seriously endangers the children."

In response, respondent argues that the court properly exercised its discretion in selecting anger-management therapy and reducing respondent's decision-making responsibility as restrictions, over a restriction to parenting time. Again, we agree with respondent.

¶ 82   In entering its order, the circuit court selected restrictions on decision-making responsibilities as to extracurricular activities, required anger-management therapy for respondent, and appointed a parenting coordinator. See 750 ILCS 5/603.10(a)(1), (8) (West 2022). The court noted that the parties had significant difficulties communicating, especially around the children's enrollment in extracurricular activities. The court's prior recommendation, that necessitated a three-week discussion period, was no longer feasible because of the significant breakdown in communication. By restricting respondent's decision-making responsibility and imposing a parenting coordinator, the court tailored its decision to address a significant issue facing the parties.

¶ 83   The court also required respondent to participate in anger-management therapy because of respondent's abhorrent behavior. The record certainly supports the court's imposition of anger-management therapy as reasonable. Respondent's behavior described in this "cold" record is deplorable. His treatment of petitioner, Dr. Auslander, Lichter, other adults in his children's lives, and E.R. generated reasonable concern for the circuit court, especially respondent's failure to recognize how his behavior towards adults impacted his children and his complete lack of contrition regarding his behavior towards these adults. While respondent continues to contend that his behavior towards the adults in his children's lives is not inappropriate, it was very reasonable for the court to view this differently.

¶ 84 Nonetheless, the circuit court declined to restrict respondent's parenting time, determining that respondent had not "impacted the children enough to rise to the level of a restriction in parenting time." Despite our significant concerns, we will not substitute our judgment for that of the circuit court. The circuit court spent a significant amount of time with the parties through the duration of this case and was in a better position to judge credibility and observe the demeanor of the witnesses. The court also was in a better position to assess the harm inflicted on the children as a result of respondent's behavior and assess any potential future harm. Overall, the court implemented relevant restrictions targeted toward the issues addressed at the June 30 hearing. We simply cannot say that *no* reasonable person would take the view adopted by the circuit court here. Accordingly, we conclude that the court did not abuse its discretion in refusing to restrict respondent's parenting time.

¶ 85                                  III. CONCLUSION

¶ 86 For the reasons stated, we affirm the court's judgment finding respondent credible and refusing to restrict respondent's parenting time. As for the petition to modify, we find that the court's denial of the petition to modify was not against the manifest weight of the evidence.

¶ 87 Affirmed.